In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3535

ARIS ETHERLY,

*Petitioner-Appellee,*

*v.*

RANDY DAVIS, Warden,*

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 0057—**Elaine E. Bucklo**, *Judge.*

ARGUED DECEMBER 11, 2009—DECIDED AUGUST 25, 2010

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* This appeal arises from the district court's decision to grant Aris Etherly's petition for habeas corpus relief pursuant to 28 U.S.C. § 2254. The district court reviewed the Illinois Appellate Court's determination that Etherly's inculpatory statement to

* Randy Davis, who became warden after this appeal was filed, has been substituted for Gregory Schwartz, as the appellant. *See* Fed. R. App. P. 43(c)(2).

the police was voluntary. Based on the applicable "totality of the circumstances" test, the district court ruled such determination by the appellate court was objectively unreasonable. As a result of this ruling, the district court granted Etherly's habeas corpus petition, denied the state's motion to stay the judgment pending appeal, and ordered the state to either retry or release Etherly within 120 days.

The state appealed the denial of its motion for a stay of release and we heard oral arguments on that issue, after which we granted by per curiam opinion the state's motion for a stay. *Etherly v. Schwartz*, 590 F.3d 531 (7th Cir. 2009). We found that because it was not reasonably likely that we would affirm the district court's decision, the traditional factors regulating the issuance of a stay outweighed Etherly's presumption in favor of release pending appeal. We now reverse the grant of habeas corpus relief.

## I. BACKGROUND

On the night of July 13, 1995, in Chicago, Illinois, then-fifteen-year-old Aris Etherly and several other members of the Gangster Disciples street gang got into a car and drove around looking to shoot and kill members of a rival gang, the Vice Lords. Jeremy Rush and Henry Wingard were standing on Wingard's front porch when the Gangster Disciples' car approached. Wingard was wearing a cap with the brim turned to the left, signifying that he was a member of the Vice Lords. When the car's occupants started shooting, Wingard safely ducked

inside the house, but Rush was not so fortunate. Rush was fatally shot in the head.

Four days after the shooting, Chicago police officers arrived at Etherly's house between 5:00 and 5:30 in the morning. When Etherly's father answered the door, police noticed that a group of people were, given the early hour, suspiciously gathered in the home. The officers informed the father that they were investigating a shooting and wanted to interview Etherly. There is some dispute concerning the details of this conversation.

The father claimed that the officers were vague, did not inform him where they were taking his son, and that they said that Etherly could be picked up in an hour. In contrast, Detectives Golab and Spencer recounted telling the father that they were taking Etherly to their Area 2 Detective Division office on 111th Street, offered for the father to follow them to the station, and provided the father with a business card. Regardless of what Etherly's father said to the police or what they said to him, the series of events that followed are undisputed.

The officers arrived at the station around 6:00 a.m. with Etherly in tow. Etherly was not interviewed until 8:00 a.m., at which time Youth Officer Frank DiGrazia arrived. With Officer DiGrazia in the room, Detective Spencer first read Etherly his Miranda rights and Etherly stated that he understood those rights. Detective Spencer then questioned Etherly. Etherly initially denied any involvement in the shooting. At no time throughout the day did Officer DiGrazia make an attempt to speak to Etherly.

With no information forthcoming from Etherly, the interview concluded after thirty minutes. Etherly then requested to use the bathroom, and he was escorted there by an unidentified uniformed officer. Upon his return from the restroom, Etherly requested to speak to Detective Spencer. DiGrazia was not present during this second conversation. Etherly told Detective Spencer that he wanted to show him where the guns involved in the fatal shooting were hidden. Detective Spencer then asked Detective Golab to meet with Etherly, and Detective Golab reminded Etherly of his Miranda rights. Etherly informed the detectives that the uniformed officer had told him that he had an obligation to tell the truth, and that "it would go better for him in court" if he helped the police to locate the guns. Detective Golab testified that he told Etherly that "they could not promise him anything other than to inform the court of his assistance," and Etherly indicated that he understood. Etherly then led the detectives to where the guns were located. The first time the state informed the trial judge of Etherly's cooperation was at the hearing on Etherly's motion to suppress his statements.

Upon his return to the station, Etherly met with Assistant State's Attorney ("ASA") Joseph Alesia, Detective Golab, and Officer DiGrazia. Alesia introduced himself to Etherly and explained that his role was as a prosecutor, not as Etherly's attorney. He then advised Etherly of his Miranda rights, which Etherly claimed to understand. Etherly requested and made a court-reported statement, to which he added his own handwritten statement. In both statements he confessed to his involvement in the shooting, including the fact that he had fired seven shots.

During the interview with ASA Alesia, Etherly said that he had been treated well by the police, that he understood his rights at all times, and that his statement was voluntary. In response to ASA Alesia's inquiry into whether anyone had made any promises in exchange for Etherly's statement, Etherly replied that the unnamed uniformed officer had told him "to get the guns so the judge would know I helped them."

Prior to the suppression hearing, the trial court ordered that Etherly be evaluated by Dr. Phillip Pan, a staff psychiatrist for Cook County's Forensic Clinical Services. In his report, Dr. Pan stated that Etherly was only marginally cooperative with the interview. He opined that although Etherly was depressed and had borderline intellectual functioning, he found that Etherly was able to understand his Miranda rights and knowingly waive them. The report concluded "that [Etherly] understands that he is not required to talk to the police, . . . [and] that he is entitled to have a lawyer present while he is questioned."

Etherly contested the admission of his statement, arguing that it had been made involuntarily and unintelligently. Etherly pointed out that his handwritten statement had a number of spelling errors. Also, Etherly's father testified that Etherly was illiterate and had been taking special education classes since the second grade. He also testified that Etherly had only attended school through his freshman year of high school, and only then by supplementing the standard curriculum with a special tutor. Still, he had failed all his courses. After

balancing all the evidence, the trial court found that Etherly's statement was voluntary. It therefore denied Etherly's motion to suppress the statement.

At trial, Etherly presented a single witness in his defense, Rebecca George. George, a teacher at the Cook County Juvenile Temporary Detention Center where Etherly was held pending trial, testified that Etherly was illiterate. George stated that Etherly progressed slowly during phonics lessons. She observed that he had difficulty knowing the sounds of the letters of the alphabet and that "he uses words . . . from how he hears other people use words."

The state's evidence at trial consisted of Wingard's testimony about the shooting; Officer Robert Baike's testimony that he recovered .380-caliber shell casings from the murder scene; Detective Golab's and Detective Spencer's accounts of the investigation, including their interviews with Etherly and his disclosure of the .38-caliber revolver's location; forensic specialist Ernest Warner's conclusion that the bullet found in Rush's brain was fired from the same weapon that fired the .380-caliber casings found at the murder scene; and then-ASA Alesia's testimony regarding Etherly's inculpatory statement. At the close of trial, the jury found Etherly guilty of first-degree murder. The court sentenced him to a forty-year term of imprisonment.

On appeal to the Illinois Appellate Court, Etherly argued, among other things, that the trial court erred in finding that his inculpatory statement to the police was voluntary. The court applied a totality of the circum-

stances test to determine whether Etherly's confession was voluntary. The court stated that the relevant factors included "the defendant's age, education, intelligence, experience, and physical condition; whether he was advised of his constitutional rights; the existence of threats, promises or physical or mental coercion; and whether the confession was induced by police deception." (Appellant App. at 36.) The court also addressed the additional factors for determining the voluntariness of juvenile statements, such as the time of day when questioning occurred, the presence or absence of a parent, and the minor's previous experience with the court system. The court stated that "[t]he overriding concern . . . is whether the defendant's will was overborne." (*Id*.)

The court found that the following factors weighed in favor of finding that the statement was involuntary: (1) Etherly was fifteen years old at the time of the statement; (2) Etherly had a lack of intellectual capacity; and (3) Etherly had no experience with the criminal justice system. The court then discussed the factors that weighed in favor of finding the statement voluntary: (1) Etherly's father was informed that his son was wanted for questioning in connection with the shooting; (2) a youth officer was present during the questioning and Etherly never requested to confer with the youth officer; (3) Etherly was read his Miranda rights on several occasions and he repeatedly indicated that he understood his rights; (4) prior to Etherly's inculpatory statement being made, Detective Golab clarified to Etherly that no promises could be made and they could

only inform the judge of his assistance; (5) Dr. Pan found that Etherly understood his legal rights; and (6) Etherly was questioned for a limited period of time.

After weighing all of these factors, the appellate court held that "the trial court's findings were not against the manifest weight of the evidence, and the totality of the circumstances indicate that defendant's confession was the result of his own decision and not the result of compulsion or his will being overborne." (*Id*. at 39.) The Illinois Supreme Court subsequently denied Etherly leave to appeal.

Etherly filed a petition for writ of habeas corpus in federal district court in which he raised six grounds for relief, the central argument being that his inculpatory statement to the police was involuntary. The district court granted Etherly's habeas corpus petition on the ground that Etherly's statement was involuntary and that the Illinois Appellate Court's determination "amounted to a[n] unreasonable application of the Supreme Court's 'totality of the circumstances' test." *Etherly v. Schwartz*, 649 F. Supp. 2d 892, 903 (N.D. Ill. 2009). The district court noted that a reasonable application of that test "compels" the conclusion that Etherly's statement was involuntary. (*Id*.)

The state filed a timely notice of appeal to this court. On appeal, the state argues that the district court erred in holding that the Illinois Appellate Court applied the totality of the circumstances test in an objectively unreasonable manner.

## II. ANALYSIS

We review the district court's grant of habeas relief *de novo. Northern v. Boatwright*, 594 F.3d 555, 559 (7th Cir. 2010). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), habeas relief may be granted only when a state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in the light of the evidence presented." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); *Morgan v. Krenke*, 232 F.3d 562, 565-66 (7th Cir. 2000).

A decision is "contrary to" federal law when the state court applied a rule that "contradicts the governing law" set forth by the Supreme Court or if the state court reached a different outcome based on facts "materially indistinguishable" from those previously before the Supreme Court. *Williams*, 529 U.S. at 405-06; *see also Calloway v. Montgomery*, 512 F.3d 940, 943 (7th Cir. 2008). A state court's application of clearly established federal law is unreasonable if it identifies the appropriate standard but applies it to the facts in a manner with which a reasonable court would disagree. *Williams*, 529 U.S. at 413; *Williams v. Thurmer*, 561 F.3d 740, 742-43 (7th Cir. 2009).

Mere error is insufficient; "[r]ather, in order to trigger grant of the writ, the state-court decision must be both incorrect and unreasonable." *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005). Under either prong of the test,

unreasonableness is judged by an objective standard. *Burr v. Pollard*, 546 F.3d 828, 831 (7th Cir. 2008). A decision is not objectively unreasonable unless it falls "'well outside the boundaries of permissible differences of opinion.'" *Starkweather v. Smith*, 574 F.3d 399, 402 (7th Cir. 2009) (*quoting Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)). Further, in performing our evaluation, we presume the factual findings of the state court to be correct, unless the petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Allen v. Buss*, 558 F.3d 657, 661 (7th Cir. 2009).

As a threshold matter, we must identify the "clearly established Federal law" at issue. For purposes of § 2254, this phrase "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Taylor*, 529 U.S. at 412. A determination of whether a confession was involuntary requires an examination of the "totality of the surrounding circumstances," including the characteristics of the person in custody and the details of the interrogation that resulted in the statement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (stating that if a defendant's confession is not "'the product of an essentially free and unconstrained choice by its maker'" and "'if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process'" (*quoting Culombe v. Connecticut*, 367 U.S. 568, 602 (1961))).

This same test applies to confessions by juveniles, but in those cases confessions are to be evaluated with

special care. *In re Gault*, 387 U.S. 1, 45 (1967); *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (*quoting Haley v. Ohio*, 332 U.S. 596, 599 (1948)). The relevant factors to consider include "the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Other considerations include the "length of time that the juvenile was questioned by the authorities and the absence or presence of a parent or other friendly adult." *Gilbert*, 488 F.3d at 791; *see also Gallegos v. Colorado*, 370 U.S. 49, 54-55 (1962). We will also carefully "scrutinize police questioning tactics to determine if excessive coercion or intimidation . . . has tainted the juvenile's confession." *Hardaway*, 302 F.3d at 765.

We recognize, however, that "it is the totality of the circumstances underlying a juvenile confession, rather than the presence or absence of a single circumstance, that determines whether or not the confession should be deemed voluntary." *Gilbert*, 488 F.3d at 793; *see also Hardaway*, 302 F.3d at 763-68 (refusing to impose a per se rule that no child under the age of sixteen may waive his rights and denying habeas relief even though a fourteen-year-old's confession was obtained without the presence of a friendly adult); *Fare*, 442 U.S. at 725.

We find, and there is no dispute, that the Illinois Appellate Court identified and applied the correct governing law to determine whether Etherly's confession was

involuntary. The appellate court recognized the correct totality of the circumstances test and applied the factors accordingly. Because relief is therefore unavailable under the "contrary to" prong of § 2254(d)(1), we turn to whether the state appellate court reasonably applied that test.

The district court concluded that the state appellate court's application of the totality of the circumstances test was objectively unreasonable. The district court based its holding on its determination that the state court either placed too much or too little weight on each factor involved. For example, the district court stated it was "more than a bit skeptical" of the weight the appellate court accorded to Etherly's age, borderline intellectual capacity, and lack of criminal background, which affected his ability to grasp whether police promised leniency in exchange for his statement. *Etherly*, 649 F. Supp. 2d at 899. Further, the district court stated that the state court placed too much weight on the lack of a promise of a "specific benefit" in exchange for Etherly's assistance, and too little weight on the unidentified officer's comments to Etherly that he "had a moral obligation" to cooperate, and if he did so, that it would "go better" for him in court. *Id*. Contrary to the state appellate court, the district court opined that Etherly understood the comments to be a promise, and that the police knew that such a suggestion was "reasonably likely to elicit an incriminating response" from Etherly. *Id*. at 899-900 (*citing Rhode Island v. Innis*, 446 U.S. 291 (1980)). The district concluded that unless Etherly

waived his Miranda rights, Etherly's statement should have been inadmissible.

The district court also said that the Illinois Appellate Court put too much weight on the lack of coercion and on the Miranda warnings provided and too little weight on the passiveness of Officer DiGrazia. According to the district court, because of Etherly's age, low intelligence, lack of experience in the criminal justice process, and the presence of a passive youth officer, Etherly could not have made a knowing and intelligent waiver of his Miranda rights.

We pause to note, however, that whether a petitioner made a knowing and voluntary waiver of his Miranda rights is a separate inquiry from a voluntariness claim, *see Edwards v. Arizona*, 451 U.S. 477, 483-84 (1981), and Etherly never raised the "knowing and voluntary" waiver argument. But because "[i]n evaluating whether a suspect voluntarily waived his *Miranda* rights, we consider the same factors . . . in assessing the overall voluntariness of a confession," *Ruvalcaba v. Chandler*, 416 F.3d 555, 562 (7th Cir. 2005), we will discuss the district court's conclusion below.

The district court's opinion notwithstanding, the Illinois Appellate Court properly addressed and considered all of the relevant factors in its analysis. How much weight to assign each factor on facts similar to those in Etherly's case may differ from court to court, and reasonable jurists may certainly disagree. *See Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997) ("The statutory 'unreasonableness' standard allows the state

court's conclusion to stand if it is one of several equally plausible outcomes."). Therefore, unless the state court's application of these factors was *unreasonable*, the grant of Etherly's habeas corpus petition must be reversed.

The Illinois Appellate Court evaluated and discussed the importance of Etherly's age. Because of his youth, the court also considered whether a friendly adult was present. The court discussed Etherly's father's awareness of the police interview, his opportunity to come to the station, and his possession of police contact information. Although his father claimed he was unable to locate his son for several days after the interview, the state trial court concluded, and the appellate court agreed, that the officers' testimony was more credible. The court also noted that Officer DiGrazia was present both during the initial questioning and at the time that Etherly provided his written confession. The court said that although the youth officer was passive, Etherly never took advantage of the opportunity to consult with him.

The district court, however, disagreed with the appellate court's finding on this latter factor, commenting that it "cannot be squared with Supreme Court and Seventh Circuit jurisprudence," and it therefore "was unreasonable for the court to consider [the youth officer] as a factor favoring a finding of voluntariness." *Etherly*, 649 F. Supp. 2d at 900-01. We agree with the district court that it is unreasonable to conclude that a fifteen-year-old, with no prior criminal experience, should be expected to seek the advice of a youth officer when that officer does not make his special role known to the

minor. But in *Fare*, the Supreme Court "held that a six-teen-year-old could make a statement intelligently and voluntarily, even without the presence of a friendly adult." *Ruvalcaba*, 416 F.3d at 561; *see also Hardaway*, 302 F.3d at 763 ("[T]he mere absence of a friendly adult is by itself insufficient to require suppression of a juvenile confession."); *Johnson v. Trigg*, 28 F.3d 639 (7th Cir. 1994) (reversing the district court's grant of habeas relief despite the uncounseled confession of a fourteen-year-old with below-average intelligence). In fact, "[e]ven re-fusing a child's request to have a parent or other friendly adult (other than a lawyer) present is not enough to suppress the confession if other factors indicate that the confession was voluntary." *Hardaway*, 302 F.3d at 765 (*citing Fare*, 442 U.S. at 718).

In other words, the youth officer does not, and should not, play the role of a lawyer to the minor. The officer's presence is more than what is required by law to safe-guard against any abuse of process or coercion. Therefore, the district court overstated the import of this factor and was incorrect in concluding that the state appellate court unreasonably weighed its impact.

The Illinois Appellate Court also recognized and weighed Etherly's lack of intellectual capacity. Although the court concluded that this weighed against admission of the statement, the court credited Dr. Pan's testimony that Etherly understood that he was not required to talk to the police and that the prosecutor would act upon any information provided by Etherly. The district court, however, appearing to engage in a *de novo* review, found

that the appellate court only paid "lip service" to this factor, concluding that the probative value and credibility of Dr. Pan's report were undermined by the fact that such report was more than one year old.

The state court's factual findings are entitled to deference, unless objectively unreasonable in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(e)(1); *Conner v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004). Here, the state court reasonably relied on Dr. Pan's report in concluding that Etherly understood his rights. Etherly did not present clear and convincing evidence to rebut the state court's reasonable reliance on this report. Therefore, the district court erred in reviewing *sua sponte* the state court's findings regarding the probative value of the report and by failing to accord proper deference to those findings. The state court did not give short-shrift to Etherly's low intelligence, and its reliance on Dr. Pan's report was not objectively unreasonable.

With regard to the remaining factors, the Illinois Appellate Court considered whether police engaged in physical or psychological coercion and determined that none existed. The court reasoned that "merely telling [Etherly] to tell the truth . . . to show the judge he cooperated does not constitute a promise of leniency nor does it evidence threats or coercion." (Appellant App. at 38.) Further, the court noted that Etherly was given his Miranda warnings on multiple occasions, including after the conversation with the unidentified officer, and he "repeatedly indicated that he understood his rights."

(*Id*. at 37.) The court also observed that Detective Golab made clear that the police could make no promises. Thus, despite Etherly's age, lack of intelligence, and lack of criminal background, the state court found that the weight of the evidence, on balance, favored admission of Etherly's statement.

We agree with the Illinois Appellate Court that the interaction with the unidentified police officer did not rise to the level of coercion. Although we think it obvious that the officer's statement was inadvisable, merely telling somebody to tell the truth is not coercive. *See Johnson*, 28 F.3d at 640-45. We also agree with the appellate court that no specific benefit was promised in exchange for Etherly's cooperation, and Detective Golab made it clear that no promises would be forthcoming.

The Illinois Appellate Court did not fail to consider relevant material factors or grossly miscalculate the balance. Therefore, in light of the fact that Etherly was read his rights several times and understood them, was questioned for a very limited period of time, and was not coerced, we conclude that the Illinois Appellate Court's determination that Etherly's statement was voluntary under the totality of the circumstances did not fall well outside the boundaries of permissible differences of opinion. It therefore was not objectively unreasonable.

## III. CONCLUSION

The Illinois Appellate Court identified the correct totality of the circumstances test, considered all relevant

factors, and made a legally defensible determination that Etherly's inculpatory statement was voluntary. Although not every reasonable jurist would have reached the same outcome, we hold that the appellate court's analysis and conclusion were not objectively unreasonable under the law. Therefore, Etherly's petition for habeas corpus relief should have been denied.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.