In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2202

TENISHA CARTER,

*Petitioner-Appellant,*

*v.*

SHERYL THOMPSON, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 1270—**William J. Hibbler**, *Judge.*

ARGUED JANUARY 13, 2012—DECIDED AUGUST 14, 2012

Before POSNER, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* After enduring 55 hours of inter-
rogation at the police station, Tenisha Carter (then just
16 years old) confessed to the murder of her roommate,
Brandy Thompson. In due course, Carter was convicted
of first-degree murder by a jury and sentenced to 30
years' imprisonment. Her case comes to this court on
appeal from the district court's decision denying her
petition for a writ of habeas corpus under 28 U.S.C. § 2254.
Applying the required deference to the decisions of the

state courts rejecting her constitutional challenges to the use of her confession, we affirm.

**I**

A state court's factual findings are "presumed to be correct" in a federal habeas corpus proceeding unless they are rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Carter does not challenge the Illinois Appellate Court's factual findings, and so our account of the facts is drawn exclusively from its opinion. Like the state court, we report some of the inconsistencies in the evidence as it developed, because this information provides useful context for the central question before us. In the final analysis, of course, the state court resolved those issues against Carter.

Thompson's body was found on December 2, 2000, by someone living in the neighborhood close to the apartment building where Carter and Thompson lived. The medical examiner confirmed that the murder was especially brutal: Thompson had been stabbed at least 117 times. Carter was then 16 years old and Thompson was 19.

The Chicago Police assigned Officers John Riordan and Kevin Carney to investigate the murder. Initially, they did not suspect that Carter was involved. No fingerprint, DNA, or other physical evidence connected the murder to Carter, or for that matter to anyone else. On December 4, however, two Chicago detectives picked up Carter at 5:40 a.m. at her grandmother's house and took her to the Area 4 police station. She was not given

*Miranda* warnings, and no one told her that she was free to leave and did not need to answer any questions. Officer Riordan offered Carter food, something to drink, a cigarette, and access to the bathroom. She asked for a soda, and Officer Riordan brought her one. Carter then gave him the contact information for her father, Calvin Robinson. At the time, Carter's mother was incarcerated. Robinson had never been Carter's legal guardian, nor had she ever lived with him. Despite her minority, Carter was thus effectively without any legal guardian.

Robinson arrived at the police station at around 9:45 a.m. He testified that he had to wait for more than an hour before he was given the opportunity to speak with the detectives or his daughter. He further testified that they permitted him to speak with Carter alone for only two or three minutes. As the state court noted, Officer Carney provided conflicting testimony, stating that Robinson was taken to his daughter shortly after arriving at the station and was allowed to speak alone with her for 30 minutes before the detectives questioned her.

Carter informed the detective during questioning that she and Thompson had a party at their apartment on the evening of December 1. After their friends left, she stated, Tyrone Weeks came over with marijuana and smoked it with them. Thompson left the apartment around midnight to visit Timothy Watkins, her boyfriend, but she never made it there. Watkins called Carter the next day to find out if Thompson was still at

the apartment. Another one of Thompson's boyfriends later stopped by the apartment looking for her. Carter initially told the detective that she was not aware that Thompson was dead until December 4. Even though Thompson's cousin and neighbor gave statements to the police on December 5 and 6 that contradicted Carter's answers, Officer Carney did not yet doubt Carter's credibility.

Carter was released to Robinson's custody after giving her statement on December 4. Mysteriously, a few hours after Carter's release, her apartment building caught fire. The investigation revealed that the cause was arson, and that the fire started in the apartment where Carter and Thompson lived. The investigators found lighter fluid, but none of the fingerprints on the bottle matched Carter or any other person tested by the police.

The police brought Carter back to the Area 4 station on December 10. After unsuccessfully attempting to contact Robinson, they proceeded to question her even though she had no adult—not her father, a guardian, or a youth counselor—present. Only Carter's boyfriend and a police officer were in the room during Officer Riordan's questioning. According to Officer Riordan, Carter was still not considered a suspect. Again, no one informed her of her rights. During this encounter, Carter's original story remained largely intact, with a few notable exceptions. She stated that Weeks had returned intoxicated to their apartment at 3 a.m., and that he grabbed at Carter. She also said that she overheard

Weeks say that he planned to rob Thompson. Carter's boyfriend corroborated her answers, stating that Carter had told him that Weeks came out of Thompson's bedroom at around 12:30 a.m. the night she died. At the conclusion of the questioning, Carter reviewed photographs for a few hours. The police could not locate her father, and so they released her to her boyfriend's father.

Officer Riordan visited Robinson's home on December 18, hoping to find Carter to discuss the murder. Robinson explained that Carter did not stay at his home often, and that he was unable to keep her from running away. He also stated that he feared for her safety, in light of the murder and arson. He was confident, however, that Carter knew who murdered Thompson. Two days later, Robinson called the police to give them Carter's latest contact information. When Officers Riordan and Carney arrived at the address, a woman opened the door with a knife. She thought they had come in response to a domestic violence call and let them in after they said they wanted to speak with Carter. Carter was indeed there; she told Officer Riordan she had attempted to contact him and agreed to return to the Area 4 station. The police later testified that Carter was still considered a witness, which is why they again did not inform her of her rights. This time, Carter would end up staying at the station for 55 hours.

When she arrived, the officers unsuccessfully attempted to contact Robinson. They then located a youth counselor who, after speaking with Carter, concluded

that his presence was unnecessary if she was only a witness. The youth counselor later left the station and did not return. When the detectives resumed questioning her, Carter's story started to fall apart. She admitted that she had lied about seeing Weeks at 3 a.m. on December 1. She then agreed to take a polygraph test. The detectives scheduled the test for the following afternoon, so that Robinson could attend. They contacted Robinson and asked if he would take Carter into his custody for the evening. According to the detectives, Robinson stated that he was worried that she would run away if they brought her there. (Robinson's account was different: he testified that they never offered to release her to him.) Officer Riordan then changed his testimony, stating that it was Carter—not Robinson—who had asked if she could stay at the station.

Officer Carney secured authorization from his supervisors for Carter to stay at the station overnight. No one explained to Carter that she was free to go, and she wound up sleeping on a bench in the interview room. She was allowed to move around the station freely, with the exception that she was escorted to the restroom. She was not given the opportunity to shower, and no one gave her a change of clothes, pillow, or blanket. Officer Riordan gave her a box of tampons after she requested it.

The next day, Carter was taken to the polygraph officer after again agreeing to take the test. The youth officer and Robinson were present. At that point, the officer gave Carter her *Miranda* warnings, asking after each one

whether she understood it. The officer conducted a pretest interview and concluded that Carter was not being honest. When Carter learned the results, she burst into tears and confessed to Officer Riordan: "John, I'm going to jail. Tyrone [Weeks] killed Brandy [Thompson] and he made me help clean up." She explained that she helped Weeks clean up after the murder because she was scared of him and his gang-affiliated family members. After this, the officers took Carter back to Area 4, where she had a meal and watched television with Robinson and two sisters in the roll call room.

The police contacted an Assistant State's Attorney (ASA) to inform him that Carter had witnessed Thompson's murder. The ASA promptly came to the station and interviewed Carter with Robinson, her two sisters, and three officers in the room. He also read Carter her *Miranda* rights and cautioned that she could be tried as an adult. After the interview, the police arrested Weeks. Carter stayed in the roll call room, on Officer Riordan's advice, because Weeks and his family were arriving at the station. Robinson asked an officer within earshot of Carter if there was any evidence from the crime scene and was informed that they had found a fingerprint on the car bumper where Thompson's body was discovered. Officer Carney said that the identity had not yet been determined. Carter then gave Officer Carney a note, stating, "I lied again." She explained that she and her boyfriend tried to find Thompson the morning after the murder. They discovered her body and moved a brick onto her feet. Carter said she was scared, apologized for lying, and said maybe someone had touched the

bumper. That evening, Robinson left to tend to his younger children. He asked that Carter stay at the station for her safety. It is not clear whether Carter was given the opportunity to leave the station: it seems that she had nowhere to go other than the street. Once again, she was not given clothes, a shower, a pillow, or a blanket.

While escorting Carter to the restroom at 2 a.m., Officer Riordan asked if she needed anything. Carter requested a soda, and Officer Riordan got her one. After returning to the roll call room, Carter inquired whether Weeks was in custody. Officer Riordan said yes. Carter then said, "I killed Brandy [Thompson]. I got in a fight with Brandy over Darnell and while I was fighting I stabbed Brandy." Carter asserted that she was merely defending herself. She confessed that Weeks had nothing to do with the murder. Officer Riordan decided to relocate Carter to the interview room, and locked her there until 9 a.m. The police notified Robinson that he should return to the station the next morning.

At 9:30 a.m., Officer Riordan read Carter her *Miranda* rights with Robinson in the room. She acknowledged her understanding of her rights and was prepared to answer the officers' questions. Without prompting from the officers, Carter said to her father, "Dad, I killed Brandy [Thompson]." Robinson said, "You're talking crazy girl. I should get you a lawyer." Carter said, "No Dad, I did it." Carter then told the officers that Thompson had punched her in the face, then went to the kitchen, got a knife, and stabbed *herself* in the chest. Carter said that she followed Thompson to her bedroom and repeatedly

punched her, which, she speculated, was how Thompson was stabbed. A little while later, Carter confessed to the arson, explaining that she set the fire to destroy any evidence connecting her to the murder.

An ASA interviewed Carter that afternoon with both of her parents in the room. (Carter's mother had apparently been released at this point.) The ASA read Carter her *Miranda* and juvenile rights. Carter said that she understood her rights and was willing to speak with him. She proceeded to explain the events leading up to Thompson's death. She said that Thompson attacked her with a knife, and they fought for a while. Eventually they got tired, and Thompson went to her bedroom. An hour later, Carter went into Thompson's room, at which point Thompson put her in a headlock. Carter stabbed Thompson with a knife to free herself. She and her boyfriend then moved Thompson's body to the street. The ASA decided not to charge her, and Carter was released later that evening. It was not until nearly two weeks later, on January 5, 2001, that Carter was arrested for first-degree murder and aggravated arson. The arson charge was later dropped.

While in jail awaiting her trial, Carter was in a 15-month intimate relationship with another inmate, Shirena Lando. When they were not cellmates, Carter sent Lando letters known as "kites" through other inmates to communicate. In one of the kites, Lando testified, Carter described Thompson's murder. The details in the kite were not entirely consistent with Carter's final confession, but she did describe Thompson's wounds, where

the body was left, and how it was hidden under leaves and a slab of concrete.

Cutting through the ever-shifting and sometimes preposterous nature of Carter's several confessions, the jury ultimately concluded that Carter was guilty of first-degree murder and she was sentenced to 30 years' imprisonment. She appealed to the Illinois Appellate Court. Among other arguments, she asserted that her confession was involuntary and thus that the trial court erred in admitting it into evidence. After describing the facts fully and acknowledging the various conflicts in the evidence, the appellate court rejected her argument; it concluded that "[b]ased on the totality of the circumstances, the manifest weight of the evidence supports the trial court's finding of voluntariness." It expressly acknowledged that a juvenile's confession is a "sensitive concern," and emphasized that such cases must be carefully evaluated to ensure that the confession was not caused by unfair influence or overwhelming emotion. Several reasons persuaded the court that Carter's confession was voluntary: it was not prompted by a police question; she had access to her father; and she was allowed to move freely around the station. Carter then sought leave to appeal from the Supreme Court of Illinois, but her request was denied.

Carter then petitioned the district court for a writ of habeas corpus, arguing among other things that the admission of her confession violated her Fifth Amendment right because the confession was involuntary. The district court found that the state court's ruling did not

involve an unreasonable application of federal law, but it granted her a certificate of appealability, "given the unusual and unfortunate circumstances surrounding Carter's interrogation, and the fact that the state appellate court did not address those circumstances in detail." This appeal followed.

## II

We review *de novo* the district court's denial of a petition for a writ of habeas corpus, *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010), bearing in mind the deferential standard that applies. Carter acknowledges as she must that she is entitled to relief only if the state court's decision "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). We will not disturb the state court's decision unless it is "both incorrect and unreasonable." *Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010). That standard is not met unless the decision in question is objectively unreasonable, falling "well outside the boundaries of permissible differences of opinion." *Id.* (internal citations omitted).

To determine whether Carter's confession was involuntary, the state court was required to evaluate the "totality of the circumstances" surrounding it. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Etherly*, 619 F.3d at 661 (stating that the *Schneckloth* test applies to juveniles, but that their confessions must be examined with "special care"). The state court was obligated to consider Carter's individual characteristics, including her "age,

experience, education, background, and intelligence"
and "whether [she] has the capacity to understand the
warnings given [her], the nature of [her] Fifth Amend-
ment rights, and the consequences of waiving those
rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). The
context of the interrogation is also relevant, especially
the "length of time that the juvenile was questioned by
the authorities and the absence or presence of a parent
or other friendly adult." *Gilbert v. Merchant*, 488 F.3d 780,
791 (7th Cir. 2007). Finally, the court had to consider
whether Carter's confession arose from "excessive
coercion or intimidation." *Etherly*, 619 F.3d at 661 (quoting
*Hardaway v. Young*, 302 F.3d 757, 765 (7th Cir. 2002)).

Carter argues that the state court failed to consider
the fact that she—a 16-year-old child—was in the police
station for 55 hours under stressful and uncomfortable
circumstances, when it was evaluating whether her
confession was voluntary. But this does not do justice
to the court's opinion. In fact, it did discuss in detail
the relevant facts surrounding her confession; it just did
so in the background and unlawful seizure sections of
its opinion. The question, therefore, is a narrow one that
practically answers itself: Did the state court violate
*Schneckloth* when it did not repeat these facts in the part
of its opinion dedicated to the voluntariness of Carter's
confession? We cannot imagine why a federal court
should care whether a state court believes that its
readers will remember the content of the background
section of an opinion or if it thinks it preferable to
review again the facts relevant to each issue. In Carter's
case, the court devoted the latter section of its opinion

to three factors: the lack of physical abuse, the fact that Carter's "will was not overcome," and the fact that her confession was volunteered rather than being given in response to a police question. It also repeated that Carter was allowed to move freely around the station and was given unlimited access to her father.

Particularly in light of the highly deferential standard due to the state court, we have no reason to doubt that it took into account all of the relevant facts, highlighting only those that seemed especially pertinent to the voluntariness of the confession. *Etherly*, 619 F.3d at 662 ("How much weight to assign each factor on facts similar to those in Etherly's case may differ from court to court, and reasonable jurists may certainly disagree."); *Gilbert v. Merchant*, 488 F.3d 780, 794 (7th Cir. 2007) (affirming the state court's finding of voluntariness even though the record "did not speak to a number of relevant considerations"). This is just what the Supreme Court found in *Early v. Packer*, 537 U.S. 3 (2002). In that case, the petitioner asserted that the California state court failed to consider certain factors in its evaluation of the "totality of the circumstances" with respect to a jury-coercion claim. The Court brushed that argument aside, noting that the California court had discussed those factors elsewhere in the opinion and commented that "[t]he contention that the California court 'failed to consider' facts and circumstances that it had taken the trouble to recite strains credulity." *Early*, 537 U.S. at 9.

In the end, while it is unsettling that Carter was in the police station for 55 hours without a blanket, pillow,

change of clothes, or access to a shower, and without being told that she could leave, the state court's decision was not objectively unreasonable. She entered the police station on December 20 voluntarily as a witness to the murder. During the lengthy time she was at the station, she was permitted to move freely until her confession on December 22 in the wee hours of the morning. The evidence suggests that Carter slept at the station because her mother was in jail and her father was concerned for her safety outside the station. She had spoken with her father and a youth officer prior to confessing and had been read her *Miranda* rights before taking the polygraph. Unprompted by the police officers, she gave her initial confession on her way to the bathroom. She turned down her father's offer to get her a lawyer. Her father was with her when she gave two of her confessions, and her mother was allowed to join her for one of them. This is enough for the state court to conclude that her confession was voluntary.

## III

We AFFIRM the district court's denial of Carter's petition for a writ of habeas corpus.