In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1660

GERMILL D. MURDOCK,

*Petitioner-Appellant,*

*v.*

STEPHANIE DORETHY,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:13-cv-01190-CSB-DGB — **Colin S. Bruce**, *Judge.*

ARGUED NOVEMBER 3, 2016 — DECIDED JANUARY 3, 2017

Before BAUER, MANION, and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* In 2003, Petitioner Germill Murdock was convicted in Illinois state court of first degree murder and aggravated battery with a firearm. In the context of his postconviction claim of ineffective assistance of counsel, a suppression hearing was held to determine whether statements Petitioner made to the police were voluntary, given that Petitioner was 16 years old and gave the statements without an attorney or other adult present. The trial court held that his

statements were voluntary and denied the motion to suppress. Both the Illinois Appellate Court and the Illinois Supreme Court affirmed that judgment. Petitioner then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied the petition, finding that the Illinois Supreme Court's decision was not unreasonable. We affirm.

## I.  BACKGROUND

In October 2001, Petitioner was charged with first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm for his role in the death of Eric Eppinger and the wounding of Sam Clark, Jr. After two mistrials due to deadlocked juries, a third jury convicted Petitioner of the murder and aggravated battery charges.

### A.  Trial and Petitioner's Statements to Police

The evidence presented by the state established that on September 4, 2001, Petitioner drove Shereaf Fleming and Cortez Trapps to a park in Peoria, Illinois, where Fleming and Trapps shot and killed Eppinger and wounded Clark. The principal issue was whether Petitioner knew about or was a part of Fleming's and Trapps' plan to shoot Eppinger when he agreed to drive them to the park.

Detective Michael Mushinsky of the Peoria Police Department gave the following testimony at trial: Approximately two weeks after the shooting, Petitioner, who was 16 years old, was involved in a traffic stop. Upon learning his identity, the officers brought him to the police station to question him about the shooting. When they arrived at the station, Mushinksy informed Petitioner that he was investigating Eppinger's

murder and advised Petitioner of his *Miranda* rights. Petitioner stated that he understood his rights and agreed to speak with Mushinksy.

Mushinksy told Petitioner what he knew about the case and asked Petitioner to tell him exactly what happened. Petitioner said that Trapps and Fleming told him that Eppinger was at Logan Park and that they wanted Petitioner to drive them there because they were going to shoot Eppinger. Petitioner told them he did not want to drive them, but he did so anyway. As they approached Logan Park, they saw Eppinger's car, and Fleming told Petitioner to park in a nearby alley. After Petitioner parked, Trapps and Fleming pulled their shirts over their faces, pulled out guns, and walked in the direction of Eppinger's car. After a minute, Petitioner heard gunshots and saw Trapps and Fleming running back to the van. Trapps and Fleming got back in the van and told Petitioner to drive away. As they drove, Trapps said he had killed Eppinger.

After the initial interview with Mushinksy, Petitioner gave a written statement, which provided essentially the same information that Petitioner had told Mushinsky. Petitioner wrote that he initially told Trapps and Fleming not to "go after" Eppinger, but that he drove them anyway. The written statement was entered into evidence at trial.

After providing the statement, Petitioner signed a video release form and agreed to give a videotaped statement, which was also entered into evidence and played for the jury. Mushinksy testified that he read Petitioner his *Miranda* rights again before recording the statement. On the recording, Mushinsky read Petitioner his *Miranda* rights once more and

Petitioner stated that he understood and waived his rights. Petitioner stated that he was answering Mushinsky's questions voluntarily. He agreed that he had not been struck, abused, or threatened by anyone to obtain his statement and that no officer had made him any promises of immunity or leniency. He also stated that he had been allowed to go to the bathroom, eat, and drink if he needed.

The recorded statement differed slightly from the written statement. On the recording, Petitioner said that when Trapps and Fleming asked him to drive them, they told him to "come on" and "not to worry about" where they were going. As they drove, Fleming stated that he knew that Eppinger was at Logan Park. As they approached the park and saw Eppinger parked in his car, Fleming said "we fixing to get him." Petitioner stated that prior to arriving at the park, neither Fleming nor Trapps said anything about shooting Eppinger. He stated that he saw the guns for the first time when he parked in the alley. Petitioner suspected that Trapps and Fleming brought the guns into the van without his knowledge by hiding them under their shirts. Petitioner recounted the rest of the events as he had in the written statement.

Petitioner did not testify at trial. The jury convicted him of first degree murder and aggravated battery with a firearm. He was sentenced to consecutive terms of 24 years for the murder and eight years for the aggravated battery.

## B. Postconviction Proceedings

Petitioner filed a direct appeal arguing that his trial counsel was ineffective for failing to file a motion to suppress his statements to police as involuntary. In an unpublished opinion,

the Illinois Appellate Court affirmed his conviction and advised that his ineffective assistance claim was better suited for postconviction proceedings.

Petitioner filed a *pro se* postconviction petition in the circuit court on May 24, 2005. He again claimed that his statements were involuntary and should have been suppressed, noting that there was no juvenile officer present and that he was not given the opportunity to speak with a guardian or concerned adult. The circuit court appointed counsel and held an evidentiary hearing on May 4, 2007.

At the hearing, Petitioner's grandmother, Dottie Robinson, testified that Petitioner was living with her at the time of his arrest in 2001. She testified that Petitioner called her and told her to come to the police station on the day he gave the statements to Mushinsky. When she arrived at the station, she told the receptionist that she wanted to see Petitioner. She was told to wait and sometime later, a detective came out and told her that he was questioning Petitioner. She asked again, but was not allowed to see Petitioner. On cross-examination, she admitted that she was not Petitioner's legal guardian. She also expressed uncertainty as to whom she spoke with at the police station. Petitioner testified that upon arriving at the police station, he asked to call his grandmother and Mushinsky said no. Petitioner testified that he was not allowed to make a phone call. Mushinksy testified that Petitioner never asked to speak with his grandmother and that Mushinsky never saw or spoke with Petitioner's grandmother. The circuit court denied the postconviction petition, finding that Petitioner could not have prevailed on a motion to suppress the statements.

The appellate court reversed. It held that, based on the totality of the circumstances, there was a reasonable probability that Petitioner would have succeeded in quashing the statements. It remanded to the circuit court with instructions to conduct a complete suppression hearing.

The suppression hearing was held on January 21, 2010. The state's only witness was Mushinsky. Mushinsky testified that he first encountered Petitioner on September 21, 2001, during the traffic stop. Prior to that time, Mushinsky had interviewed other witnesses and had probable cause to believe that Petitioner was involved in the shooting at Logan Park. He testified that he and another officer brought Petitioner to the police station and had him wait in an interview room. Petitioner was not handcuffed, but was not free to leave. Mushinsky asked Petitioner if he wanted anything to eat or drink, but Petitioner declined. He read Petitioner the *Miranda* warnings from a printed card, and Petitioner said he understood and agreed to speak with Mushinsky.

Mushinsky testified that he called Petitioner's grandfather to inform him that Petitioner was at the station. Mushinsky stated that Petitioner's grandfather came to the station, but never asked to speak with Petitioner. Mushinksy said that Petitioner never asked to see or speak to either of his grandparents, never asked to see an attorney, and did not refuse to speak with Mushinsky at any point during the interview. Mushinsky testified that he did not make any promises to Petitioner, nor did he threaten or coerce him in any way. He gave Petitioner a *Miranda* waiver form before the video interview, read it to him, and Petitioner signed it. According to Mushinsky, Petitioner never seemed to be in distress.

On cross-examination, Mushinsky said that if Petitioner had asked, he would have been allowed to see a parent or guardian. He stated that, during the interview, he was acting as both the investigating officer and the juvenile officer. Mushinsky denied that he told Petitioner he would not be charged if he gave up the "trigger man."

Petitioner testified that he was handcuffed during the traffic stop and taken to the police station. He stated that Mushinsky began to ask him about the shooting without first reading his *Miranda* rights. He testified that Mushinsky told him that if he gave up the "trigger man," he would be allowed to go home. Petitioner stated that he made requests to see a parent or guardian to both Mushinksy and another officer at the station. He agreed that Mushinsky read the *Miranda* warnings before the video statement, but said that he did not fully understand them. Petitioner testified that he felt tired and scared while making the video statement.

On January 28, 2010, the circuit court denied the motion to suppress in an oral ruling. The court held that, although he was a juvenile, Petitioner "had the mental capacity to understand his situation, [the] proceedings, his rights, and to make a voluntary decisions and statements." The court found that the officers did not threaten or coerce the Petitioner and that his testimony that he was scared was belied by his demeanor in the video. The court was concerned by the fact that an adult was not present for the interview, but also noted that there was no evidence that Petitioner's grandfather requested to see Petitioner and was denied that opportunity. The court held, based on the totality of the circumstances, that Petitioner's statements were voluntary.

The appellate court affirmed, holding that the circuit court's findings were not against the manifest weight of the evidence. The Illinois Supreme Court granted leave to appeal and also affirmed, with three justices dissenting. The Illinois Supreme Court first made clear that it was reviewing only the evidence from the suppression hearing held on January 21, 2010, declining Petitioner's request to consider his grandmother's testimony from the 2007 evidentiary hearing.[1] The Illinois Supreme Court relied on the circuit court's factual findings, agreeing that Mushinsky was more credible than Petitioner. The court considered Petitioner's age and the absence of a parent or attorney, but found that "the absence of a concerned adult did not create a coercive atmosphere so as to render [Petitioner's] statements involuntary." The court noted that Petitioner seemed to understand and waive his *Miranda* rights; that he was not threatened or coerced; that he was given access to food, drink, and restrooms; and that he did not appear to be under distress. The court held, based on the totality of the circumstances, that Petitioner "made his statements freely and voluntarily and absent any compulsion of inducement."

Petitioner then filed a petition in federal court seeking relief under 28 U.S.C. § 2254. The district court denied the petition. It held that the Illinois Supreme Court's decision that his statements were voluntary was not unreasonable. This appeal followed.

---

[1] Petitioner's trial, the 2007 evidentiary hearing, and the 2010 suppression hearing were held in front of three different judges. Petitioner's grandmother did not testify at the 2010 hearing, and the presiding judge was not otherwise made aware of her previous testimony.

## II. DISCUSSION

We review a district court's denial of a habeas petition *de novo*. *Gonzales v. Mize*, 565 F.3d 373, 379 (7th Cir. 2009) (citation omitted). Where a state court has adjudicated a habeas petitioner's claim "on the merits," the Antiterrorism and Effective Death Penalty Act (AEDPA) limits the circumstances under which a federal court can grant a habeas petition. *See* 28 U.S.C. § 2254(d).

As an initial matter, Petitioner argues that the AEDPA does not apply here because his core claim was not "adjudicated on the merits" by the Illinois Supreme Court. Petitioner's post-conviction ineffective assistance claim was denied by the circuit court after the evidentiary hearing in May 2007. On appeal, the case was remanded for a full suppression hearing without directly addressing the ineffective assistance claim under *Strickland v. Washington*, 466 U.S. 668 (1984). Because what followed was an appeal from the circuit court's denial of the motion to suppress on remand, Petitioner now argues that the Illinois Supreme Court did not adjudicate his *Strickland* claim "on the merits," and therefore, the AEDPA does not apply.

We disagree. Petitioner's ineffective assistance claim was premised on his counsel's failure to file a motion to suppress his statements prior to his trial. Under *Strickland*'s two-pronged analysis, a defendant must first show that his counsel's performance was deficient. *Id.* at 687. Then, the defendant must show that, but for counsel's failure, the result of the proceeding would have been different. *Id.* at 694. In this case, the second prong requires a determination of whether Petitioner would

succeed on a motion to suppress his statements as involuntary. That is precisely the question that the circuit court answered—and that the Illinois Supreme Court reviewed—after the January 21, 2010 suppression hearing. Therefore, regardless of whether the Illinois courts analyzed his claim explicitly under the *Strickland* framework or as a standalone suppression issue, Petitioner's claim has been "adjudicated on the merits" and AEDPA deference applies.

Where, as here, a state court adjudicates a prisoner's claim for postconviction relief, the AEDPA mandates that a federal court may grant a habeas petition only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We apply these standards to the decision of the Illinois Supreme Court as that was the last state court that substantively adjudicated Petitioner's claim. *Gonzales*, 565 F.3d at 379.

We must first set forth the "clearly established Federal law" at issue. The voluntariness of a confession is determined by analyzing "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Shneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "Special caution" is required when evaluating a confession made by a juvenile. *In re Gault*, 387 U.S. 1, 45 (1967). "In juvenile cases, the totality approach requires an 'evaluation of the juvenile's age, experience, education, background, and intelligence' as well as the circumstances regarding the

confession." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Those circumstances include the length of the interrogation and whether the juvenile had a parent, lawyer, or other adult present. *Etherly v. Davis*, 619 F.3d 654, 661 (7th Cir. 2010) (citation omitted); *see also Gallegos v. Colorado*, 370 U.S. 49, 55 (1962). The voluntariness determination, though, does not turn on the presence or absence of a single factor, but instead requires "careful scrutiny of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226; *see also Hardaway*, 302 F.3d at 766 ("[T]he mere fact that [petitioner] was 14 and questioned without an adult present does not by itself render his confession involuntary, but it does require that a court conduct a searching review of the facts … .").

We find, and Petitioner does not dispute, that the Illinois Supreme Court applied the correct governing law to determine whether Petitioner's statements were voluntary. Thus, Petitioner's main argument on appeal is that the Illinois Supreme Court unreasonably applied that governing law. Under the AEDPA, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). "A state court decision must be more than incorrect from the point of view of the federal court … ." *Hardaway*, 302 F.3d at 762. It must also be unreasonable, "which means something like lying well outside the boundaries of permissible differences of opinion." *Id.* (citing *Williams*, 529 U.S. at 411). "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

In support of his argument, Petitioner attempts to analogize the facts of his case to cases in which this Court and the Supreme Court of the United States found the confessions of juveniles to be involuntary. Specifically, Petitioner points to *Haley v. Ohio*, 332 U.S. 596 (1942), *Gallegos v. Colorado*, 370 U.S. 49 (1962), and *A.M. v. Butler*, 360 F.3d 787 (7th Cir. 2004).

In *Haley*, a 15-year-old confessed to a murder after he was questioned by police from midnight until 5:00 a.m., without an attorney or other adult present, and without being advised of his right to counsel. 332 U.S. at 598. In *Gallegos*, a 14-year-old confessed to an assault and robbery after being held in a juvenile facility for five days, during which time he did not see a lawyer or other "friendly adult." 370 U.S. at 49–50. In *Butler*, a 10-year-old boy confessed to murdering his neighbor after he was interrogated multiple times without his mother or another friendly adult present. 360 F.3d 792–94. In all three cases, the courts evaluated the totality of the surrounding circumstances and determined that the confessions were involuntary. *See Gallegos*, 370 U.S. at 55 (citing the factors that weighed in favor of involuntariness); *Haley*, 322 U.S. at 600–601 (same); *Butler*, 360 F.3d at 800–801 (same).

Petitioner argues that, based on the analysis and outcome of these three cases, the Illinois Supreme Court reached the wrong outcome in his case. Under the AEDPA, however, that is not the relevant inquiry. *See Williams*, 529 U.S. at 410 (Under the AEDPA, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."). The fact that some of the factors cited by the *Haley*, *Gallegos*, and *Butler* decisions may also have been present in this case does not mean that the Illinois Supreme Court was bound to come

to the same conclusion. A different conclusion in light of similar facts does not render the Illinois Supreme Court's application of the law unreasonable. *See Etherly*, 619 F.3d at 662 (citation omitted) ("How much weight to assign each factor on facts similar to those in [Petitioner's] case may differ from court to court, and reasonable jurists may certainly disagree.").

What is important is that the court applied the correct test in a reasonable manner. The court clearly considered, and afforded some weight, to Petitioner's age, as well as the fact that he did not have an attorney or other adult present when he gave his statements. It also found, however, that Petitioner was able to understand and provide an adequate waiver of his rights. Mushinksy read him those rights, and Petitioner waived them, multiple times. The court considered the fact that Petitioner was detained for approximately seven hours on the day he gave his statements. However, it also noted that the interview lasted only three hours and that Petitioner was given the opportunity to eat and use the restroom throughout his detention. There was no evidence that the officers threatened Petitioner or otherwise created a coercive environment. The court found that Petitioner did not appear to be under distress or frightened on the video recording. Though Petitioner's grandfather was present at the police station, he never requested to speak with Petitioner. Despite the absence of a concerned adult, the court found that the totality of the circumstances indicated that Petitioner gave his statements voluntarily.

The Illinois Supreme Court correctly applied the totality–of–the–circumstances test and considered the appropriate

factors.[2] No one factor is determinative in this analysis, *Schneckloth*, 412 U.S. at 226, and reasonable minds can differ on the results of such a balancing test. *Etherly*, 619 F.3d at 662. In our view, the court's application of the totality of the circumstances test was not unreasonable because it does not lie "well outside the boundaries of permissible differences of opinion." *Hardaway*, 302 F.3d at 762.

Finally, we address Petitioner's argument that the Illinois Supreme Court based its decision on an unreasonable determination of the facts, an argument that requires little analysis. Petitioner argues that the court improperly relied on his demeanor as it appears on the video recording to make findings about his condition throughout the entire interview. This is simply not true. The portions of the Illinois Supreme Court's decision that Petitioner cites in support of this argument clearly indicate that the court was discussing Petitioner's demeanor only during the period of time that was recorded. The court did find that Petitioner was "in good physical condition during his detention and interview," but it made clear that this finding was based on *both* the videotape and the

---

[2] We note here that Petitioner argues that the Illinois Supreme Court erred in declining to consider the testimony of Petitioner's grandmother from the 2007 hearing. We disagree. On his initial appeal from that hearing, Petitioner specifically requested, and received, a new suppression hearing. Petitioner offers no explanation for why his grandmother did not testify again and he does not contend that he was prevented in any way from presenting her testimony at the 2010 hearing. Because it was not presented to the fact finder at the 2010 hearing, the Illinois Supreme Court determined it could not consider the testimony in its review on appeal. We find no support, and Petitioner offers none, for finding error in that determination.

testimony from the suppression hearing. It is also true that the court gave considerable weight to the video recording in its overall balancing of factors. However, as we have demonstrated, we cannot quarrel with that balancing, given that it was not unreasonable under the AEDPA's standards. Therefore, we do not find the court's factual determinations based on the video to be unreasonable.

Petitioner has failed to demonstrate that the decision of the Illinois Supreme Court involved an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Therefore, under the AEDPA's deferential standard of review, we are compelled to accept the decision of the Illinois Supreme Court.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.